WIEAND, Judge,
dissenting:
I respectfully dissent. There is in this appeal no need to remand for further proceedings. The circumstances which led the trial court to order blood tests to aid it in determining paternity were fully presented by the parties, and there is no need for an additional evidentiary hearing to explore further the issue of estoppel. Indeed, appellants have not requested remand for an evi-dentiary hearing, and their argument on appeal, as I understand it, is that, in order to preserve a subsequently created family, we should recognize another exception to the legislatively authorized use of blood tests to determine true paternity. After careful review, I would refuse to create an additional exception under the circumstances of this case and would affirm the order of the learned trial court.
A son, B.T., was born to N.E.E. on June 22, 1990. During the possible period of conception, N.E.E. had engaged in sexual relations with three men, M.C.E., C.T.D., and S.M., any of which could have been the father of the child. Because of this uncertainty the child’s birth certificate stated that his father was unknown. Sometime before the child was born, however, a steady relationship developed between the child’s mother and M.C.E., who thereafter participated in prenatal care and was present at the birth of B.T. In June, 1991, N.E.E. and M.C.E. began living together, and, on December 31, 1991, they were married. N.E.E. thereupon took her husband’s last name, and, in March, 1992, husband and, wife had B.T.’s birth certificate amended to reflect that M.C.E. was his father and that the child was to be known by M.C.E.’s last name. Subsequently, a daughter was also born of the marriage of N.E.E. and M.C.E.
Shortly after learning that she was pregnant with B.T., N.E.E. had sent a letter to C.T.D. stating that either he or S.M. was the father of the child.[1] Subsequently, C.T.D. wrote several letters to N.E.E., which she answered. Following the birth of B.T., C.T.D. called N.E.E. by telephone, and during this conversation N.E.E. told C.T.D. of her relationship with M.C.E. There was no further contact between N.E.E. and C.T.D. until March 24,1992, when N.E.E. received a letter from a lawyer purporting to represent C.T.D. and S.M. and requesting that all parties submit to blood tests to establish the paternity of B.T. N.E.E. and M.C.E. refused to undergo such testing.
On June 22, 1992, C.T.D. filed a complaint seeking partial custody or visitation with the child, B.T.[2] Two days later, a petition for blood tests was filed. Pursuant thereto, counsel for the parties agreed that a consent order should be entered directing that such tests be made, and an order directing blood tests was entered. Subsequently, however, N.E.E. employed other counsel, who moved to set aside the prior order on grounds that counsel had lacked authority to agree to it. M.C.E. was now also joined as a party to the action. Following a hearing, the trial court directed the parties to submit to blood tests. N.E.E. and M.C.E. appealed from this order.[3]
The right to obtain blood testing to determine paternity is provided by the Uniform *33 Act on Blood Tests to Determine Paternity, 23 Pa.C.S. § 5104. The Act provides, in part, as follows:
(c) Authority for test. — In any matter subject to this section in which paternity, parentage or identity of a child is a relevant fact, the court, upon its own initiative or upon suggestion made by or on behalf of any person whose blood is involved, may or, upon motion of any party to the action made at a time so as not to delay the proceedings unduly, shall order the mother, child and alleged father to submit to blood tests. If any party refuses to submit to the tests, the court may resolve the question of paternity, parentage or identity of a child against the party or enforce its order if the rights of others and the interests of justice so require.
23 Pa.C.S. § 5104(c).
“There is no situation of more monumental importance, or more worthy of due process protection, than the creation of a parent-child relationship.” Corra v. Coll, 305 Pa.Super. 179, 193-194, 451 A.2d 480, 488 (1982). “ ‘While the Act creates a statutory right to obtain blood testing to determine paternity, the right is not absolute and must be balanced against competing societal/family interests.’ ” McCue v. McCue, 413 Pa.Super. 71, 74, 604 A.2d 738, 739 (1992), allocatur denied, 531 Pa. 655, 613 A.2d 560 (1992), quoting Donnelly v. Lindenmuth, 409 Pa.Super. 341, 597 A.2d 1234 (1991). A child has a right to know and be supported, financially and emotionally, by his or her biological father. See: Mastromatteo v. Harkins, 419 Pa.Super. 329, 336, 615 A.2d 390, 394 (1992), allocatur denied, 535 Pa. 648, 633 A.2d 152 (1993); Koleski v. Park, 363 Pa.Super. 22, 30, 525 A.2d 405, 408 (1987). Moreover, a parent’s “right to ‘the companionship, care, custody and management of his or her children’ is an important and legally protectible interest.” Koleski v. Park, supra at 29, 525 A.2d at 408, quoting Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551, 558 (1972). See also: Lassiter v. Department of Social Services of Durham County, 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981). It is also clear, however, that the Commonwealth has an interest in promoting and preserving the stability of an intact family. See: Everett v. Anglemeyer, 425 Pa.Super. 587, 594, 625 A.2d 1252, 1256 (1993); Coco v. Vandergrift, 416 Pa.Super. 444, 448, 611 A.2d 299, 301 (1992).
In John M. v. Paula T., 524 Pa. 306, 571 A.2d 1380 (1990), cert. denied, 498 U.S. 850, 111 S.Ct. 140, 112 L.Ed.2d 107 (1990), the Supreme Court of Pennsylvania held that a third party who stands outside a marital relationship will not be permitted to challenge a husband’s claim of parentage by requesting blood tests under the Act. In such cases, the Court said, the presumption that the child is the issue of the husband is irre-buttable and conclusive and cannot be rebutted by the results of blood tests. In a concurring opinion by Nix, C.J., joined by a majority of the members of the court, he wrote: “Whatever the interests the putative father may claim, they pale in comparison to the overriding interests of the presumed father, the marital institution and the interests of this Commonwealth in the family unit.” Id. at 322-323, 571 A.2d at 1388.
The decision in John M. v. Paula T., supra, is not on all fours with the instant case. Here, there is no presumption that M.C.E. is the biological father of B.T., for B.T. was not born during coverture. M.C.E. and N.E.E. were not married until after the child had been born.
This also is not a case in which C.T.D. is estopped from asserting paternity. Estoppel is aimed at “achieving fairness between the parents by holding them both to them prior conduct regarding the paternity of the child.” Jefferson v. Perry, 432 Pa.Super. 651, 656, 639 A.2d 830, 833 (1994). Thus, in Matter of Montenegro, 365 Pa.Super. 98, 528 A.2d 1381 (1987), a proceeding to amend the name of the father appearing on a child’s birth certificate, the Superior Court held that after a father had been designated on the child’s birth certificate, had married the child’s mother and had lived with the child in a family relationship for five years, he was estopped from relying on blood tests to disprove paternity. See also: Wachter v. Ascero, 379 Pa.Super. 618, 550 A.2d 1019 (1988); Manze v. Manze, 362 Pa.Super. 153, 523 A.2d 821 (1987). Similarly, it has been held, a *34 mother will be estopped from attempting to disprove the paternity of a man whom she has held out to be the father of her child. See: Gulla v. Fitzpatrick, 408 Pa.Super. 269, 596 A.2d 851 (1991); Christianson v. Ely, 390 Pa.Super. 398, 568 A.2d 961 (1990); Seger v. Seger, 377 Pa.Super. 391, 547 A.2d 424 (1988). See also: Adoption of Young, 469 Pa. 141, 364 A.2d 1307 (1976); In re Estate of Simmons-Carton, 434 Pa.Super. 641, 644 A.2d 791 (1994).
In the instant case, it may well be that M.C.E. would be estopped from denying paternity of B.T. in an action for B.T.’s support and that N.E.E. would also be estopped from denying M.C.E.’s paternity. However, M.C.E. and N.E.E., by their conduct, cannot cause C.T.D. to be estopped from asserting his alleged paternity. C.T.D. has not taken action or acquiesced in action that is inconsistent with his claim of paternity; and, therefore, he cannot be deemed estopped from asserting his own paternity by the conduct of those whose interest it is to assert otherwise.
In its desire to prevent C.T.D. from challenging N.E.E.’s paternity of B.T., the majority has failed to give adequate consideration to C.T.D.’s right to share in the support and companionship of a child who may be his own. This, as we have observed, the courts have held to be an important and legally protected interest. Indeed, the Supreme Court of the United States has stated that “[w]hen an unwed father demonstrates a full commitment to the responsibilities of parenthood by coming forward to participate in the rearing of his child, his interest in personal contact with his child acquires substantial protection under the Due Process Clause.” Lehr v. Robertson, 463 U.S. 248, 261, 103 S.Ct. 2985, 2993, 77 L.Ed.2d 614, 626 (1983) (citation omitted). Moreover, while B.T. may presently know M.C.E. as his father, he has a right to learn, at an appropriate time, the identity of his biological father. He may also have pecuniary interests, such as rights of support and inheritance which can be enforced if his true father is determined.[4]
The legislature has established that an “action or proceeding ... to establish the paternity of a child born out of wedlock [for support purposes] must be commenced within 18 years of the date of birth of the child.” 23 Pa.C.S. § 4343. In view of this policy, which has been established by the legislature, I cannot accept the majority’s proposition that the biological father of a child born to an unmarried woman can be estopped from asserting paternity merely by failing to act for a period of less than two years. Such a holding, in my judgment, violates fundamental notions of fairness.
Several days after B.T. was born, C.T.D. called N.E.E. to inquire about the child. The two people spoke briefly about B.T.; but N.E.E. told C.T.D. that she “had found somebody else.” N.E.E. subsequently began living with M.C.E., and the two were later married. Under these circumstances, I find it especially difficult to believe that C.T.D. should have acted more quickly and can now be estopped from determining, by blood testing, whether he is the biological father of the child born to N.E.E.
The legislature, when it enacted the Uniform Act on Blood Tests to Determine Paternity, established a clear policy for Pennsylvania. That policy was to sanction the use of blood tests in any proceeding in which the paternity of a child was a relevant fact. 23 Pa.C.S. § 5104(c). In the absence of a policy decision of the Supreme Court to the contrary, the policy established by the statute is determinative. This policy clearly authorizes a trial court to order blood tests where, as here, paternity is a relevant fact. The majority cites no authority, and indeed there is none under the present state of the law, which would preclude the use of blood tests under the facts of this case.[5]
My review leads me to conclude that the trial court, acting pursuant to and in agreement with legislative authority, properly ordered blood tests to assist in determining whether C.T.D. is the biological father of B.T. When it did so, the court did not abuse *35 its discretion. Therefore, I would affirm, Inasmuch as the majority concludes otherwise, I respectfully dissent.

. M.C.E. was not named in this letter as a possible father of the child.

. S.M. was also a party to this complaint, but he subsequently withdrew.

. The order is appealable. See: Jones v. Trojak, 535 Pa. 95, 634 A.2d 201 (1993).

. See: Koleski v. Park, 363 Pa.Super. 22, 30, 525 A.2d 405, 408 (1987).

. The majority's citation to 23 Pa.C.S. § 2511(a)(1) is not persuasive. This provision is not analogous to the present circumstances in which actual paternity is very much in doubt.